ACADEMY CHICAGO PUBLISHERS *et al.*, Plaintiffs-Appellants, v. MARY W. CHEEVER, Defendant-Appellee.

First District (3rd Division)   No. 1—89—0506

Opinion filed June 27, 1990.

McBride, Baker & Coles, of Chicago (Thomas R. Leavens and Marc L. Fogelberg, of counsel), for appellants.

Frankfurt, Garbus, Klein & Selz, P.C., of Chicago (Martin Garbus, Maura Wogan, and Russell Smith, of counsel), for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiffs, Academy Chicago Publishers (Academy) and Franklin H. Dennis (Dennis), filed a second amended complaint for declaratory relief against defendant, Mary W. Cheever, in the circuit court of Cook County. Plaintiffs sought a declaration of the parties' rights under a contract: (1) granting Academy the exclusive right to publish a work tentatively entitled, "The Uncollected Stories of John Cheever"; (2) designating Dennis as the work's editor; and (3) obligating defendant to deliver the manuscript from which the work was to be published.[1] After a trial on the merits, the trial court entered a judgment declaring, *inter alia*, that the contract executed by the parties was valid and enforceable. Plaintiffs appeal from that judgment.

In addition to declaring the parties' contract valid and enforceable, the trial court declared that, pursuant thereto: (1) defendant was entitled to select the stories of her late husband to be included in the manuscript to be delivered to Academy for publication; (2) she would comply with her obligations of good faith and fair dealing if she delivered a manuscript of at least 10 to 15 stories aggregating at least 140 pages; and (3) Academy controls the design and format of the work to be published but it must exercise that control in cooperation with defendant. Plaintiffs' appeal specifically challenges the last two declarations of the trial court.

Being too voluminous to be stated briefly, we will discuss the facts only as pertinent to the points raised on appeal by plaintiffs.

I

Plaintiffs first contend that the declaration that defendant would satisfy her obligations of good faith and fair dealing under the contract by delivering a manuscript of 10 to 15 stories and, at least, 140 pages is an improper advisory opinion because no issue concerning the manuscript was either in controversy or litigated in this action.

■ Of all the arguments made by the parties on this issue, we are convinced that the rule, cited by defendant, against piecemeal de-

---

[1]John Cheever, who died in 1982, was a Pulitzer Prize winning American author. Defendant, Mary W. Cheever, is the widow of John Cheever.

claratory judgments is dispositive. Plaintiffs argue on appeal that the trial court should have limited its declarations to confirming the validity of the contract and to requiring defendant to deliver a manuscript thereunder. We cannot agree.

In so arguing, plaintiffs ignore that they also requested a declaration that they had the right to publish the 68 Cheever stories appended to their second amended complaint. Plaintiffs readily acknowledge that fact relative to other arguments of the parties on the instant issue. However, in the context of the piecemeal declaratory judgment arguments, they ignore that that request necessarily required the trial court to determine the number of stories, between none and 68, which defendant was required to submit for publication in keeping with her contract obligations. The reason that that request necessarily required the trial court to make that determination is that the contract between the parties failed to establish in any way the number of stories which defendant was obligated to submit for publication or which plaintiffs had the right to publish.

That failure of the contract made the issues of its validity and the parties' required performances thereunder separate and distinct. That is, because the contract failed to establish the number of stories to be submitted by defendant or published by plaintiffs, we do not believe the trial court was required, if it found the contract valid and enforceable, to accept plaintiffs' contention that they had the right to publish all 68 stories, appended to their second amended complaint. Logically then, if the trial court did not have to accept that contention, it was free, within the bounds of its discretion, to determine either the number of stories which defendant was required to submit or which plaintiffs had the right to publish under the contract.

In short, we find that, by requesting a declaration that they had a right to publish a certain number of stories in the face of a contract which was silent on that issue, plaintiffs necessarily, albeit tacitly, requested declaration as to the number of stories which they did have a right to publish if the trial court did not agree with the number proffered by them. Plaintiffs did put defendant's contract performance obligations with respect to the manuscript "in controversy," contrary to their assertion that they did not. As such, the court did not issue a merely advisory ruling in determining those minimum obligations. Moreover, case law involving the rule against piecemeal declaratory judgments supports the trial court's action in this regard.

In *Krebs v. Mini* (1977), 53 Ill. App. 3d 787, 368 N.E.2d 159, the plaintiffs prayed for declarations that there was a partnership or

joint venture agreement between them and the defendant for the purchase and operation of a corporation and that the defendant held two-thirds of the stock of the corporation as trustee for the plaintiffs' benefit. In affirming the denial of that relief, the court held that a declaration that the parties were partners or joint venturers would still leave them in controversy over such questions as the terms of their agreement and whether there had been a breach of those terms. Likewise, it held that a declaration that the defendant held two-thirds of the stock of the corporation as trustee for the plaintiffs would not solve the problem of the time and terms of the stock's issuance or transfer to the plaintiffs.

In this case, plaintiffs not only asked for a declaration of a valid agreement with defendant, like the *Krebs* plaintiffs, but also, unlike them, sought a declaration regarding the major or most important term, at least from their perspective, of that agreement, *i.e.*, the number of Cheever stories which defendant was required to allow plaintiffs to publish. As such, we agree with defendant that a failure by the trial court to settle that latter question, in the face of the requested declaration, would have guaranteed further litigation and would thus have violated the rule against piecemeal declaratory judgments. Moreover, inasmuch as plaintiffs did request a declaration of the number of Cheever stories they were entitled to publish, it cannot be said that the trial court entered a declaration that was not requested or, in other words, that plaintiff's prayer for relief did not allow the court to enter a judgment disposing of the entire controversy between the parties. See *Farmers Insurance Group v. Harris* (1972), 4 Ill. App. 3d 372, 376, 279 N.E.2d 789.

The cases cited by plaintiffs for the proposition that courts cannot issue advisory opinions do not require a contrary conclusion. In *Howlett v. Scott* (1977), 69 Ill. 2d 135, 370 N.E.2d 1036, which noted, *inter alia*, that courts have no authority to issue advisory opinions, the court found premature a declaratory judgment action, by the then Illinois Secretary of State, for a declaration that a certain business relationship of his had not created a conflict of interest where the defendant, the then Illinois Attorney General, had not indicated his intent to prosecute an action against the Secretary of State at the time the declaratory action was filed. *Howlett* is clearly factually inapposite here. See also *People ex rel. Barra v. Archer Daniels Midland Co.* (7th Cir. 1983), 704 F.2d 935 (declaratory judgment that Federal law preempted State law was premature where no action had been instituted under latter law).

In *State Farm Mutual Automobile Insurance Co. v. Morris*

(1961), 29 Ill. App. 2d 451, 173 N.E.2d 590, *cert. denied* (1961), 368 U.S. 878, 7 L. Ed. 2d 78, 82 S. Ct. 124, which noted, *inter alia*, that courts cannot give advice with respect to hypothetical or anticipated future problems, the court found premature an insurer's declaratory judgment action for declarations as to its obligations under one of its policies. It did so on the bases that: (a) as to the requested declaration that it was not obligated to pay any damages which its insured might become legally obligated to pay, the plaintiff had an adequate remedy in any future garnishment action against it were any third parties to obtain judgments against its insured; (b) as to the requested declaration that it was not obligated to pay the medical expenses of any claimants against its insured not conditioned upon her liability to them, the plaintiff had an adequate remedy in any future suit against it by any such claimant; and (c) the requested declaration that it was not obligated to defend any suit against its insured would constitute giving an advisory opinion and, in light of the impropriety of declarations as to the foregoing matters, would violate the prohibition against piecemeal declaratory judgment litigation. *Morris* is patently inapposite to this case.

In *Continental Illinois National Bank & Trust Co. v. Bailey* (1982), 104 Ill. App. 3d 1131, 433 N.E.2d 1098, which noted that courts should not declare the rights of parties on a state of facts which has not arisen or on a matter which is future, contingent and uncertain, the court found premature the entry of a declaratory judgment that the share of the testamentary trust established by the will at issue, which was to go to one of the testator's children, Jennie, would be distributed among the issue of the testator's other children should Jennie's children die without issue within 21 years after her death, or 2002, when Jennie's share was to be distributed. In declining to enter the judgment requested, the court noted that before any question as to the interpretation of the will could arise with respect to the distribution of Jennie's share, both of her surviving issue had to die before 2002 and without leaving any issue. The court concluded that there was no certainty or even any reason to believe that that would happen. This case did not involve a matter anywhere near as contingent, uncertain and speculative as that involved in *Bailey*. It is of no assistance to plaintiffs.

In *Nelson v. City of Rockford* (1960), 19 Ill. 2d 410, 167 N.E.2d 219, the supreme court, after affirming a declaration that a zoning ordinance was invalid, nonetheless found premature the trial court's direction of the issuance of building permits where such relief had not been requested. What we have said above regarding the declara-

tion as to the number of Cheever stories plaintiffs were entitled to publish, which plaintiffs sought in this case, makes it unnecessary to further distinguish *Nelson.*

Finally, in *Swim Club of Rockford, Ltd. v. City of Rockford* (1985), 130 Ill. App. 3d 353, 473 N.E.2d 1375, the court, after affirming a declaration that a zoning ordinance was invalid, also found invalid the imposition of certain restrictions on the proposed special use of the plaintiff's property as the assumption of a legislative role by the trial court. Plaintiffs cite *Swim Club* for the proposition that a trial court cannot act as an uninvited arbiter. However, given the declarations which plaintiffs sought here, we cannot say that the contested declaration was as unsolicited as that in *Swim Club.*

Having concluded that defendant's contract performance obligations were in controversy in this action, we must next determine whether plaintiffs had an opportunity to litigate the issue and, thus, to make a record on the issue.

Just as we have found that plaintiffs put the minimum number of stories which defendant was required to submit for publication in controversy by requesting a declaration that they were entitled to publish the 68 stories appended thereto, we also find that, by adducing evidence to support that claim, plaintiffs litigated, albeit implicitly, the minimum number of stories which defendant could submit under the contract were the trial court to disagree with the number proferred by them. In this regard, we do not believe that the trial court was required to advise plaintiffs of the possibility that it might find that defendant could submit a much lower number of stories in order for us to find that this issue was actually litigated. Rather, that possibility was manifest at trial in view of: (1) defendant's position that the contract was void and that she was not required to deliver any stories for publication thereunder; (2) the evidence which she introduced, in an effort to meet plaintiffs' contention, as to the contents of prior Cheever collections; and (3) the total failure of the contract to contain any minimum number of stories whatsoever.

■ The next point we must address is whether the trial court's own characterization of its declaration with respect to defendant's minimum performance obligations as "advisory" warrants a contrary conclusion. This point does not give us much pause in view of the well-settled law that a reviewing court passes upon the correctness of a trial court's judgment, not its rationale or reasoning in entering that judgment. That being the case, the fact that the trial court characterized its ruling with respect to defendant's good-faith and fair dealing obligations under the contract as an "advisory declaration" is

of no moment. Whether or not the trial court realized it, defendant's minimum performance obligations under the contract were in controversy before it.

## II

Plaintiffs next contend that, even if the issue of defendant's good-faith and fair dealing obligations were properly before it, the trial court abused its discretion in declaring that defendant would satisfy those obligations by delivering a manuscript of any 10 to 15 stories of at least 140 pages.

■ In this vein, they first assert that the declaration improperly ignored the limitations implied in the contract on defendant's selection of stories. In reference to these limitations, plaintiffs argue that the trial court should have considered "the circumstances involving the makeup and delivery" of the manuscript the contract obligated her to deliver, such as the number of words, the extent to which stories in the public domain were included in the manuscript, and "any content that might denigrate or otherwise detract from the collection or Academy's ability to market the book in a manner consistent with its reputation for quality." Plaintiffs further assert that the limitations implied in the contract required consideration of the circumstances of her submission of the manuscript, including its timeliness and any conditions placed on the acceptance of the manuscript, and the fact that Academy, as a high-quality publisher, bargained for a high-quality and complete collection of Cheever stories.

Even assuming that the trial court was required to consider the limitations on the defendant's discretion in rendering her contract performance which were implied therein, we do not believe that the limitations asserted by plaintiffs were, with one exception, implied in the contract. The relevant portions of the contract provide:

"Whereas the parties are desirous *** of publishing and having published a certain work *** tentatively titled The Uncollected Stories of John Cheever (hereinafter referred to as the Work);

Therefore, in consideration of the mutual covenants contained herein, the parties do hereby agree as follows:

1. [Defendant] grants to [Academy], during the full term of copyright of the Work and all renewals and extensions of copyright, the exclusive right to print, publish and sell the Work in book form in the English language throughout the world, and the exclusive right to license its publication in all languages throughout the world.

2. [Defendant] will deliver to [Academy] on a mutually agreeable date one copy of the manuscript of the work as finally arranged by [Dennis] and satisfactory to [Academy] in form and content.

\* \* \*

5. Within a reasonable time and a mutually agreeable date after delivery of the \*\*\* manuscript, [Academy] will publish the work at its own expense, in such style and manner and at such price as it deems best[.]

6. [Academy] will apply for copyright \*\*\* in conformity with the Copyright Law of the United States and the Universal Copyright convention in the name of [defendant] and may effect any renewals or extensions of copyright provided for by law."

The foregoing provisions are the most important relating to the performance due under the contract by plaintiffs and defendant. We do not find implicit in these provisions any of the limitations upon defendant's performance which plaintiffs assert were implied therein, with one exception.

Before discussing that exception, we must note the language in paragraph 2 that defendant was to deliver a manuscript which was "satisfactory to [Academy] in form and content." Plaintiffs have not argued on appeal that Academy could have imposed the limitations which they assert are implicit in the contract upon defendant's performance pursuant to this language. Nor could they have so argued. Where a contract provides that it is to be performed in a manner "satisfactory" to one of the parties, that provision is construed as meaning that the performance must be such that the party, as a reasonable person, should be satisfied with it. (*Hoff v. L. Gould & Co.* (1916), 198 Ill. App. 499 (abstract of opinion).) Beyond that, however, we believe it would be unreasonable to construe the "satisfactory to [Academy] in form and content" language of the contract as imposing the substantive limitations asserted upon defendant's performance.

The limitation upon defendant's performance which we do find implicit in the foregoing provisions, as well as the rest of the contract, is the limitation as to her submission of stories in the public domain, *i.e.*, as to which the copyright, for which Academy bargained in the contract, could not attach. The contract reveals on its face that the copyright for the work was an important element as far as Academy was concerned. As Academy bargained therefor and as defendant agreed thereto, we do not believe that defendant could de-

feat Academy's copyright in rendering her contract performance. However, as we will discuss more fully below, we find no error by the trial court in its failure to consider the limitation upon defendant's inclusion of stories in the public domain which was implicit in Academy's bargained for copyright in the work to be published under the contract.

As we do not find that any of the proffered limitations upon defendant's performance, with the one exception noted, were implicit in the contract, we do not find that the trial court erred in failing to determine her minimum performance obligations without considering those limitations.

■ Plaintiffs next assert that the trial court should have also considered general publishing industry practice in determining defendant's minimum performance obligations under the contract. Specifically, they argue that the court erred in failing to consider the undisputed industry practice of using the number of words to define the length of a manuscript.

After reviewing the record, we do not find either that the trial court failed to consider the use of number of words in publishing industry practice in defining the length of manuscripts or, as plaintiffs imply, that they proved that use of the number of words of a manuscript is required in the industry in defining its length.

As support for the latter point, plaintiffs cite the testimony of Robert Markel, a publishing executive for 26 years, that word length is a common form of defining a manuscript in a publishing contract and of Rhoda Gamson, the director of contracts and copyrights for Viking, Penguin, Inc., that a form publishing agreement for an anthology of short stories would usually be modified by inserting either the name of the stories, their number, or the number of words, but not the number of pages.

Beyond the fact that the contract employed by plaintiffs manifestly failed to conform to the contract drafting practices testified to by Markel and Gamson, we also find that their testimony fails to warrant a conclusion that use of the number of words in a manuscript is a *sine qua non* in defining its length. That the use of that aspect of a manuscript in defining its length is "common" and also used in so doing, along with the number of stories (which measure the trial court used here), does not make it *de rigueur*.

Moreover, the record conclusively reveals the fallacy of plaintiffs' assertion that the trial court did not consider the use of the number of words in the manuscript as a guide in defining its length. After the trial court declared defendant's minimum performance obligations

with respect to the manuscript to be delivered to them, plaintiffs requested that the trial court also define those obligations in terms of the number of words to be included therein. In ruling upon this request in a memorandum opinion, the trial court painstakingly considered the proposed additional standard by comparing the number of words in the manuscript submitted by defendant to the number of words in several comparable prior Cheever anthologies. That the trial court ultimately rejected defining defendant's performance obligations in terms of the words in her manuscript does not reveal that it did not consider that standard. Moreover, in light of the inadequacy of Markel's and Gamson's testimony in the aspect above discussed, we will not find error in the trial court's rejection of that standard.

■ Next, plaintiffs assert that the trial court erred in declaring that defendant could choose any 10 or 15 stories for the manuscript without regard to Academy's copyrights and exclusivity rights because defendant's selection of stories in the public domain would destroy or injure Academy's right to receive the benefits of its bargain.

The short answer to plaintiffs' argument is that the mere possibility that their contract rights might be injured by defendant's selection of nine stories in the public domain, out of the 15 included in the manuscript, is insufficient to establish that the trial court abused its discretion in failing to address the number of such stories which defendant could include in the manuscript. That is, without alleging actual injury, we do not believe that plaintiffs have been prejudiced by the asserted failure of the trial court.

■ Plaintiffs next assert that the trial court also erred in failing to address the question of whether defendant was required to select stories for her manuscript which were consistent with plaintiff's desire to demonstrate the evolution and development of Cheever's talent as a writer. The problem with this argument is the same as that with the other limitations upon defendant's performance which plaintiffs have asserted and which we have found nonexistent in the contract. That is, the instant limitation was neither implicit or explicit in the contract. That being the case, just as with the other limitations, we do not believe the trial court was required to consider the instant limitation in determining defendant's contract performance obligations. If plaintiffs' intent in entering the contract with defendant was to demonstrate the development of Cheever's writing skills, they should have so stated explicitly therein.

■ Plaintiffs next assert that the trial court erred in relying upon a statement made by Academy's vice-president to the proposed author of the work's introduction, that the work would go "consider-

ably beyond the stereotyped perceptions of [Cheever's] work," in determining the parties' intent regarding the content of the work. Specifically, plaintiffs assert that the trial court misinterpreted this statement, which was merely a reference to the thematic range of the content of the work, as referring to its size.

Preliminarily, we must admit that we find it somewhat difficult to address this argument in view of the fact that the trial court did not so much rely on the statement above quoted as evidencing the parties' intent with respect to the size of the work as it relied on it as an admission by Academy that the compilation of 68 stories, which it was proposing to publish, exceeded the norm with respect to Cheever collections. Secondly, to the extent that the trial court may have misinterpreted the statement as an admission by Academy as to the size of the work, we are hard pressed to understand how plaintiffs can complain. Interpreted as such, the statement supported Academy's argument that it had a right under the contract to publish as many stories as it wished. That is, construed as plaintiffs allege, the statement helped rather than hurt their argument that their intent in contracting with defendant was to publish a large book. As such, and as plaintiffs do not allege that the trial court failed to consider the statement in determining defendant's performance obligations, we find plaintiffs' argument unavailing in revealing error by the court in this regard.

■■ Plaintiffs next assert that the trial court erred in setting defendant's performance obligations in sole reliance upon her intent in contracting with plaintiffs. However, the record conclusively belies plaintiffs' argument.

In setting those obligations, beyond defendant's subjective intent and understanding as to the size of the work, the trial court also relied upon the following: (1) the contract did not define the size of the work, contrary to industry practice; (2) when it was executed, Academy's vice-president had no idea as to the number of previously uncollected stories which plaintiffs' research would find; (3) the tentative title of the work shed no light on the issue because, as a matter of fact and industry practice, tentative titles stated in publishing contracts do not define the size of the work; (4) Academy is a relatively small publishing house; (5) except for the Pulitzer Prize winning collection of Cheever stories published by Knopf in 1978, all other collections of Cheever stories contained about 10 to 15 stories and ran about 140 to 260 pages; and (6) Dennis, the work's editor, was principally a publicist with almost no editing experience in the previous 10 years. In view of the additional factors considered by the trial court

and supporting the declaration complained of, we find no error in its partial reliance on defendant's subjective understanding of the size of the work plaintiffs desired to publish. *Cf. DeBow v. City of East St. Louis* (1987), 158 Ill. App. 3d 27, 510 N.E.2d 895 (error in admission of evidence does not require reversal if there has been no prejudice or if trial outcome not materially affected thereby).

Plaintiffs also assert that the court erred in failing to take into consideration the Pulitzer Prize winning Knopf collection of Cheever stories published in 1978 in setting defendant's contract obligations. Simply stated, we do not agree with plaintiffs that the fact the trial court did not set a page limit for the manuscript approaching the 700 pages of the Knopf collection reveals that it failed to consider the collection in setting the standards for the manuscript. Plaintiffs assert (without any citation to the record, we might add) that the Knopf collection "changed the standards and literary expectations against which all subsequent collections would be measured." We find, however, that the trial court was in a better position than this court to decide that question. Therefore, we will not substitute our judgment for the trial court's in this regard.

Plaintiffs similarly assert that the trial court improperly failed to consider the tentative title of the work stated in the contract and the support which that title gave to Academy's position that it had the right to publish all of the previously uncollected Cheever stories it had found in setting the manuscript standards. In view of Dennis's own testimony to the effect that the tentative title of the work, so called in the contract, was just that, the trial court did not err in failing to give any weight to it in setting the manuscript standards.

## III

The next issue raised by plaintiffs is that the trial court erred in declaring that the manuscript submitted by defendant met the minimum performance obligations set by the court. The majority of the arguments made in support of the instant contention are repetitive of those made in support of the second point raised on appeal. As such, we find it necessary to address only one: that defendant violated her good-faith and fair dealing obligation by conditioning Academy's acceptance of the manuscript which she submitted on: (1) its acquiescence to her approval of the advertising, promotion and sale of the work; and (2) its agreement to limit the number of books printed and sold.

We believe that the advertising, promotion, and sale of the work and the number of books to be printed and sold are all matters of

publication, over which paragraph 5 of the parties' contract explicitly granted exclusive control to Academy. Thus, we believe that defendant's right to condition Academy's acceptance of the manuscript is controlled by our disposition of the fourth issue raised by plaintiffs. That issue is whether the trial court erred in declaring that Academy must consult with defendant on all matters of publication of the manuscript. We conclude below that the trial court erred, given the explicit language of the contract granting exclusive control of publication matters to Academy. For that same reason, we must also conclude that defendant does not have the right to condition Academy's acceptance of the work on its acquiescence to her attempt to affect matters of publication.

## IV

In raising the fourth issue, plaintiffs specifically assert that the trial court erred in considering extrinsic evidence to interpret the contract, regarding the matter of control of publication, in view of the contract language explicitly granting exclusive control of that matter to Academy.

Defendant does not substantively address the fourth issue raised by plaintiffs. Instead, she alleges that plaintiffs have not preserved it for appeal by failing to include it in their notice of appeal. Plaintiffs assert that they preserved the issue by seeking in their notice of appeal "vacation of the trial court's findings with respect to the *scope* of the Publication intended by the parties."

The purpose of a notice of appeal is to inform the party prevailing in the trial court that the other party seeks a review of the judgment; to this end, the notice of appeal is liberally construed, and defects in form will not deprive the reviewing court of jurisdiction. (*McMahon v. McMahon* (1981), 97 Ill. App. 3d 448, 422 N.E.2d 1150.) For instance, in *Rinck v. Palos Hills Consolidated High School District No. 230* (1979), 82 Ill. App. 3d 856, 403 N.E.2d 470, the appellate court held that the plaintiff's failure to refer to the dismissal of count I of her amended complaint in her notice of appeal did not preclude her from asserting on appeal error in the dismissal of that count as well as count II of her complaint, to which the notice did refer. The court noted that a "notice of appeal should be considered as a whole and where the notice fairly and adequately sets out the judgment appealed from so as to inform the successful party of the nature of the proceedings, the absence of strict technical compliance with the form of notice is not fatal." (*Rinck*, 82 Ill. App. 3d at 859.) The court concluded that, since the order specified in the

notice of appeal as the judgment appealed from had dismissed both counts of the amended complaint, the notice of appeal was sufficient to advise the defendants of the nature of the proceedings and that the language therein referring to count II of the amended complaint was surplusage. *Rinck*, 82 Ill. App. 3d at 859.

In view of the foregoing, plaintiffs have not waived the right to appeal from the instant aspect of the trial court's judgment. Addressing the merits of their argument, moreover, we agree that the trial court erred in looking beyond the four corners of the parties' contract to make the declaration of which plaintiffs complain.

As plaintiffs note, under Illinois law, there is a presumption that an agreement, when reduced to writing, reflects the intention of the parties. (*Payne v. Coates-Miller Inc.* (1982), 105 Ill. App. 3d 273, 434 N.E.2d 306.) Ordinarily, that intent is determined from the language embodied in the parties' final agreement (*Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 405 N.E.2d 1051), and a court can consider extrinsic evidence to ascertain their intent only when the language of the agreement is ambiguous (*Lenzi v. Morkin* (1984), 103 Ill. 2d 290, 469 N.E.2d 78).

The foregoing rules, in essence, comprise the parol evidence rule. That rule is a rule of substantive contract law rather than a rule of evidence. (*Bank of Naperville v. Holz* (1980), 86 Ill. App. 3d 533, 407 N.E.2d 1102.) Therefore, a mere rule of evidence which would allow the consideration of evidence otherwise incompetent under the former rule cannot be applied to defeat the bar of the rule. As such, the only possible basis for the trial court's consideration of the extrinsic evidence complained of which our research has uncovered, *i.e.*, the rule regarding the admissibility of acts which comprise the *res gestae* of an occurrence, event or transaction, is an insufficient justification for the trial court's action. The court erred as a matter of law in considering extrinsic evidence to reach a determination which altered and contradicted the clear and unambiguous language of the contract. *Kendall v. Kendall* (1977), 46 Ill. App. 3d 559, 360 N.E.2d 1242, *aff'd* (1978), 71 Ill. 2d 374, 375 N.E.2d 1280.

Finally, given the silence of the contract on the main issue in this appeal, *i.e.*, defendant's performance obligations, there is no inconsistency between our affirming the trial court's action thereon and our reversing its ruling on this last issue. The trial court properly considered extrinsic evidence to determine the parties' intent on matters upon which the contract was silent. In *Spitz v. Brickhouse* (1954), 3 Ill. App. 2d 536, 539-40, 123 N.E.2d 117, it was stated that "[i]f [a contract] is silent in essential particulars, parol evidence is admissible

to establish the missing parts, although inadmissible to contradict those unambiguous terms expressed in the [contract]." Accord *Bleck v. Stepanich* (1978), 64 Ill. App. 3d 436, 381 N.E.2d 363.

For all of the foregoing reasons, the judgment appealed from is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

CERDA, P.J., and WHITE, J., concur.